Good morning, Your Honor. My name is David Lawrence. I represent the appellants in this action with the exception of Hernan Delgado, who is represented by Ms. Ashley Clark, although she will not be addressing the court this morning. So it's just you? Just me. Okay. I'd like to reserve five minutes for rebuttal, if I could. Okay, let's look at the clock and try to keep track. Thank you. This is a case that, pursuant to Ninth Circuit authority, in effect since 1992, should not have gone to trial. The district court lacked jurisdiction, having denied plaintiffs' Truman v. Wright motion, and as a result, the entire trial was a nullity. This isn't real jurisdiction, right? I was trying to figure out whether this was something that Congress had said that the district court doesn't have authority to hear a case. But there is no statutory prohibition on the district court, right? It's just judge-made law. It's judge-made law, and it really goes back to a Seventh Circuit case, Apostle v. Galleon, which put into effect this certification procedure. I mean, there had to be some procedure to determine where jurisdiction exists once the Supreme Court found that qualified immunity was subject to an interlocutory appeal. But we've even held under some circumstances that even if the district court makes an error, it can be harmless. Why wouldn't we find harmless error in this context, given that the 52.1, the Bain Act, claims raised the same Eighth Amendment issue and could have gone forward? There are a variety of errors in the trial. If you're just talking about jurisdictional-wise... Why wouldn't we find that the district court's failure to certify as frivolous the appeal of a subset of the defendants was harmless error? What's the prejudice? Because the notice of appeal is an act of jurisdictional significance. The court did not have jurisdiction... Well, it's not true. It's not real jurisdiction. We've already established that. It's just the Ninth Circuit has said that the district court doesn't have the authority to proceed. But we've made exceptions to that. We have a number of cases raising harmless error, saying that it was harmless error. The immunity is an immunity from trial, not just a defense to the case. But not for 52.1, not for the Bain Act issues, which are exactly the same, right? They're not exactly the same, no. And that's one of our arguments on appeal here. So what was the prejudice? What was the prejudice? What was the prejudice for having the appeal, the trial go forward, notwithstanding the interlocutory appeal? The prejudice was those 21 defendants who had pending interlocutory appeals had a right to have those issues heard by this court. So they didn't have to stand trial. And you won't find cases where... I mean, this is an unusual case because of the number of defendants. It started out with 40. It got whittled down to 28 who went to trial, 19 of whom were found liable. So do you agree, though, that the district court had the authority to go forward on the Bain Act claims against those, because there's no qualified immunity under California law? I agree the qualified immunity does not apply to the Bain Act cause of action. But I think that the 52.1 claim was related to the issues on appeal, and therefore the district court did not have jurisdiction over the 52.1 claim. That doesn't mean that the Ninth Circuit... How can that be? I understand that they're not required to go to trial on the 1983 qualified immunity while a valid appeal is pending. I mean, that's the basic rule, but that's an entirely different cause of action. It's a state law cause of action. There's nothing in state law that says they don't have to go to trial. I understand that, Your Honor. But you're saying they don't have to go to trial on the state law causes of action so long as their 1983 qualified immunity is on appeal. I don't get it. I don't think they did, but even if they did, I think it was an egregious abuse of discretion to whittle up this case and go to trial on certain claims while there were valid interlocutory appeals pending before this court. It may be a problem with respect to going to trial on the 1983 claims, but I have trouble seeing how it's an abuse of discretion to go forward on the state law claims as to which there was no defense of qualified immunity. And if we're just looking at the state law, no reason to hesitate going to trial. And you know as well as I do, maybe even better, if you've got a multi-defendant trial like this, it is just the devil's work to schedule it. It is. It is. I think all the more reason why the court should have stayed the trial and allowed the qualified immunity appeal process to work its way through the Ninth Circuit and we would go back and then we could try the entire case at the same time with jurisdiction over all of the defendants, over all of the claims. There are other... How did you make your record at the time before the trial judge that you did not want to proceed? Well, first of all, the plaintiffs filed a Truman motion which was denied by the court, and the court acknowledged that it did not have jurisdiction. We filed a motion to stay trial which was denied by the district court. Right, and so did you say we're proceeding without waiving our objection? No, we did not. We objected to proceeding with trial, and Plaintiffs' Council vigorously asserted that they were entitled to proceed with trial, notwithstanding the interlocutory appeal. And that flies squarely in the face of Truman v. Wright, Apostle v. Gallien and all the other circuits that have adopted that certification procedure when there's a denial of summary judgment on a qualified immunity issue. Isn't there a prejudice that comes from moving ahead, even if you have some claims that are not impaired in terms of the trial court's jurisdiction, because the momentum from trying all of the facts against all of the defendants, even those who theoretically or presumably have a right to have the interlocutory appeal decided, that you get a different dynamic at the trial by virtue of having everybody there and all the issues being tried when some may not need to be there or that evidence shouldn't be coming into trial. There's sort of a dynamic that changes when you've got everybody there on all claims. I agree with Your Honor, and I think one of those significant errors was the court's denial of the motion to bifurcate this trial. These cases are always bifurcated. When there's a police excessive force case and a Monell case, a Monell claim along with it, the Monell aspect of the case is always bifurcated. In this case, you couldn't find a case for a... Now, what's your evidence for that? That's not my experience, at least sitting up here on appeal. Maybe it's because they're always bifurcated and they never make the motion, but that's news to me. Well, this court recently reversed the denial of a bifurcation order, of a non-bifurcation order in Diaz v. City of Anaheim. Now, that was a little bit reversed because in that case, the plaintiff, the decedent, wanted the trial bifurcated because there was evidence of drug usage and gang membership, and he didn't want that coming in in the liability phase. They went ahead with trial. The court did not bifurcate the trial. The evidence of drug usage and gang membership came in in the liability phase, and this court said that was an abuse of discretion not to bifurcate damages and liability, relying upon the cases that had bifurcated the Monell claims from the underlying claims in police cases. And the most significant case on that is Quintanilla v. City of Downey. In this case, the jury was told that a blue-ribbon panel of individuals who were retired federal judges, retired U.S. attorneys, a sitting chief of police, members of the community, and an expert in corrections had all sat on this Citizens Commission on Jail Violence panel and come up with these findings, and the jury read the findings from the CCJV, and those findings included that use of force against inmates was disproportionate to the threat or there was no threat at all, several key department leaders ignored deputy aggression and discouraged discipline at the Men's Central Jail, that Deputy or Captain Cruz, who was one of the defendants, encouraged then-Lieutenant Borman to spend not too much time investigating deputy misconduct and allegations of excessive force. Would all of that have come in if only the state cause of action had been tried? No. Because? Why not? Because there's no Monell equivalent for the 52.1 claim, and this is not evidence relating to this incident itself. This was a study of the Men's Central Jail conducted by a commission put together by the Board of Supervisors for the County of Los Angeles. Go ahead, sir. So no, this would not have come in if only the 52.1 claim had been tried. Weren't there some 1983 claims that weren't subject to the interlocutory appeal? I thought there was. That's true. Yeah, so at least with respect to those, the district court was not precluded from going forward. It could go forward with those few defendants who did not file interlocutory appeals. That's true. I submit that it wasn't. So as to them, then the Monell claim would be live. Well, it doesn't really relate to them. The Monell claim is against the County of Los Angeles. And so bringing in that evidence, first of all, it couldn't come in against them individually under Evidence Rule 404. It would be other bad acts that did not relate to them that would be prejudicial to them. We've got 1983 claims going on then against some individuals and against the County of Los Angeles. Now, of course, the County of Los Angeles does not have qualified immunity. Correct. Are you saying that, quite aside from the interlocutory appeal problem, that there should have been a severance in any event, whether or not there was this interlocutory appeal problem? That's a totally freestanding argument? I'm saying that there should have been a bifurcation of trial. I'm saying that the Monell evidence, which was extraordinarily prejudicial, these individual defendants did not have a chance for a fair trial when they heard all of these findings of the CCJV read to them by this blue-ribbon panel who had already decided and condemned the men's central jail. And we're reviewing this under an abuse of discretion standard for the bifurcation? That's correct, Your Honor. Who pays the damages, assuming damages are sustained and awarded against the officers employed by the county? Who actually pays them? The county pays the compensatory damages. Punitive damages are the obligation of the individual defendants. However, the Board of Supervisors, if they make certain findings, can, after the fact, make a decision to pay those punitive damages. So the statutory obligation is for the county to pay the compensatory damages? That's correct, Your Honor. And then it's really, in a sense, the option of the county whether or not to pay the punitives? Correct. Did the non-protonc order cure the Schumann problem? Absolutely not. Talk to me about that. Sure. Non-protonc orders do not exist to go back and correct errors. A non-protonc order exists to go back and make the record reflect what actually happened. And plaintiffs cite no cases to the contrary. They cited one Supreme Court case, a dissenting opinion, which was overruled, suggesting that perhaps that sort of procedure could be employed. But non-protonc orders exist to make the record reflect things that actually happened, to correct errors and omissions in the record. So if the district court, after the fact, says this was frivolous, I guess because it wasn't jurisdictional in the first place, in the sense of the district court was without any authority, I guess it's up to this court, sort of another just judge-made law, to say, well, we'll acknowledge it or we'll accept that. There's nothing that would preclude the court from doing that, right? There's no statutory bar on doing that. Nothing to preclude the court from entering the order non-protonc? No. For us to say it's sufficient if a district court makes its determination after the fact, what would preclude us from saying that? I mean, we made up a rule in Schuman, and we can now elaborate on the rule in this case. What would prevent us from doing that? In Stewart v. Dongus, you had almost exactly the same set of facts and procedures that took place. The only difference was there was no Schuman motion that was filed. The case went forward in trial. There was a finding for the plaintiffs, and the Tenth Circuit said the trial was a nullity because there wasn't jurisdiction at the time the trial went forward. That was probably before the Supreme Court decided Bowles v. Russell, and we thought that we could make up jurisdiction. You've lost me on that one. I'm sorry. I mean, it's not actual jurisdiction. So the district court, there was nothing that prevented the district court from going forward with the trial except for our decision in Schuman. But in Claiborne and other cases, we said, you know, there can be harmless error. So if it was truly jurisdictional, we couldn't say that an error was harmless. The district court would simply have no authority. I think it was jurisdictional. I think jurisdiction has to exist somewhere. If there's the denial of a qualified immunity motion on summary judgment and there's a notice of appeal filed, jurisdiction is in the Ninth Circuit unless and until the district court issues a certification that the appeal is frivolous or waived or the Ninth Circuit dismisses the appeal, neither of which happened in this case. But in this case, the district judge found that the qualified immunity request was frivolous because it was based on facts and controversy, right? Nine months after the fact. No, but her ruling in denying the qualified immunity was because there are facts and controversy, right? Right. At the get-go. But that doesn't preclude review of a denial of summary judgment on qualified immunity by the circuit court. Right. It doesn't preclude it, but it does express a frivolousness finding by the district court, which is the exception to the certification process. I know of no case that says that because the district court said there are disputed issues of fact, that's the equivalent of a finding of frivolousness. And I haven't seen any cited by the appellees in this case. Well, it's a little hard to say that it's frivolous from the get-go on that basis because you really don't know what's going to be litigated. You do know afterwards what was actually litigated or sought to be litigated on appeal, and you can tell afterwards if it's frivolous. It's a little hard to know at the outset. It is, particularly when the district court did not articulate what the material facts were that were in dispute. So what do we do if the district judge properly, and I don't ask you to concede, but if the district court properly determines that the appeal actually was frivolous? I'm sorry. Well, what do we do with what we have here, that is to say the Truman motion is denied at the outset? Right. But afterwards, when the judge understands the entire case, having sat through the trial, understands what the appeal was going to be and was, says, you know, that appeal was frivolous. And let's assume that she's right. It was frivolous. I submit to the court that the court did not have jurisdiction while the trial was proceeding,  How do you explain, then, the cases where we said it was harmless error? I'm not familiar with. With Claiborne, and there were a couple in that line. I think the other side cites. I didn't see a case where, cited by plaintiffs, where there was a qualified immunity appeal, where it was denied, where there was a Truman motion that wasn't denied. Did you move to reconsider the Truman motion? Denial? Plaintiffs asked later on for the court to enter nunc pro tunc, a finding that the appeal was frivolous. And that happened nine months after the trial. What's the practical consequence if your worst nightmare comes true? In the sense that we have, well, I'm not sure your worst nightmare. Half of your nightmare comes true. We affirm on the merits everything except the Truman, and you win on that. But all the other things we say, the district judge made no error. What's the practical, what will be the practical consequence if we win? Well, I mean, there are so many issues. For one thing, the punitive damages were only pursued under federal law, and those defendants had pending qualified immunity appeals. So they're gone. They vacate the punitive damages award. Anything else go away? It's difficult for me to answer that question. There are so many issues in this case, Your Honor. One thing I'd like to address, if I could, is juror number five. I think that's a significant issue in this case. Juror number five. Well, you know, you're running down on time. To my mind, juror number five, I understand juror number five, but it's pretty well explained in the briefs. I can't imagine a clearer case for implied bias than juror number five. There is no explanation as to why, during Ward Dyer, he forgot that his father was an attorney, even though he acknowledged that his mother, a well-known civil rights attorney. I don't think he forgot that his father was an attorney. I think he forgot to mention the ACLU connection. No, he didn't mention him at all in Ward Dyer. Was he asked whether your father was an attorney? Well, the question was asked, do you know attorneys or do you have family members who are attorneys, questions of that nature, and he identified his mother. He did not identify his father. After the jury is impaneled, he identifies his father, and as it turns out, his father was a sitting vice president of the Southern California ACLU and a former sitting president of the ACLU, which had very similar cases against the County of Los Angeles. They had issued reports, one of which entitled Cruel Unusual Punishment, How a Savage Gang of Deputies Control L.A. County Jails, other similar papers. The ACLU was monitoring the jails through a consent decree under the Rutherford case. The ACLU was up to its neck in involvement in the L.A. County jails. When you take that into consideration with, first of all, that jury became the foreperson. His mother, the day after the case went to the jury, wrote an op-ed piece in the L.A. Times saying there should be civilian oversight of the L.A. County jails and saying that the problems at the jails had persisted, notwithstanding efforts that had been made to fix problems at the jails. There was the issue of Obie Anthony, who was the fellow who was convicted of murder, who, jury number five's mother, as part of the instance project, helped secure his release from prison, who then became represented by plaintiff's counsel. There's Richard Drorian, who was the general counsel for the Citizens Commission on Jail Violence, who was a very close friend of jury number five. When my clients heard all of these connections that jury number five had to all of these people whose interests were adverse to the L.A. County Sheriff's Department and the jails. Now, what was new information that came out afterwards? I think the only new information that comes out afterwards is the father. No, the father and his connections, and that's significant because of the ACLU's involvement. I get that, but I'm trying to figure out what information did you have at the time that you were making your peremptories. You knew about his mother. Knew about his mother. You knew about, I'm having trouble with the name, Obie Anthony. Yeah, and Drorian. And Drorian. You knew about that. We knew about that. Yeah, you knew a lot. We knew a lot, and he should have been excused for cause based on all of those things. You could have done a peremptory. We were out of peremptory challenges. He was the last juror in the box. So by the time he comes up there, you have no peremptories. We had no peremptories. Did you ask the judge for extra strikes? We did not ask for extra strikes, no. That's a pretty routine request, at least in my experience. I've never seen that happen, but I— May I ask you another question on another topic, please? Yes. If you prevail in this appeal, where will that leave you? Do you have to have a retrial? Well, it depends on how we prevail. Retrial on everything? How we prevail. What are you asking for? What I'm asking for is that the court find that the 52.1 claim is not cognizable under this court's Lyle opinion, that the plaintiffs did not exhaust their administrative remedies, so that would eliminate the 1983 claim. The Lyle opinion eliminates the 52.1 claim, and judgment should be entered for all the defendants on all claims. If we disagreed with you on your 52.1 argument and thought that there was no problem with how it was instructed and tried, what's the effect of the decisions on the Eighth Amendment violation issue with respect to the interlocutory appeal? I was a little confused on that. So on the interlocutory appeal, we're supposed to take the facts in the light most favorable to the nonmoving party, but now we have jury fact-finding on some of the Eighth Amendment issues. I'm not sure it affects that, frankly. So it doesn't have any binding or collateral effect? I've never seen the situation arise, but it would seem odd to be ignoring the actual jury determinations in the same case that were actually litigated. It seems like there would be some sort of preclusive effect. There may be. There may be, which is why I was arguing that the 52.1 claims are part of the appeal, or at least related to the appeal. We've taken you well over time. Thank you. There are lots of complications in this case. There are. Let's go from the other side, but we will make sure you have enough time on rebuttal to say what you need to say. Thank you. I appreciate that. Good morning, Your Honors. May it please the Court. My name is Caitlin Weisberg. I'm here on behalf of plaintiffs' appellees. And is it just you who's going to argue? Just me who's going to argue. Not that that's not enough. Only me who's going to argue. I just didn't see that. Yeah, sorry. Defendants carried out deliberate and intentional violence against plaintiffs in this case. This was not force used to defend or force used to control. It was force used to punish, to show the inmates in Men's Central Jail who was boss, essentially. The jury had more than enough evidence to find that defendants used excessive force, maliciously and sadistically, for the purpose of causing harm. And although defendants raised numerous issues, they are not challenging the sufficiency of the evidence in this case to prove the Eighth Amendment violation. And this, I think, goes to Judge Okuda's question, because there is Supreme Court and Ninth Circuit precedent that where there's been a trial, the facts of the trial are what you look at, not the facts of the summary judgment record, if I understood your question correctly. I just was wondering, if we agreed with your opposing counsel that the district court urdent going forward on the trial of the 1983 claims, with respect to those defendants who took an interlocutory appeal, which means, then, that the interlocutory appeal is before us, what's the effect of the decision on the Eighth Amendment violations at the trial that did take place? And I wasn't sure how we would consider them. I just haven't seen that case before. Sure. Does it have a preclusive effect, or does it have no effect at all, which is what the opposing counsel says? Do the factual determinations by the jury have a preclusive effect? Or the qualified immunity determination? Absolutely, I think they do. And Ninth Circuit law is clear on this, that you have to give deference to the findings made by the jury when you determine qualified immunity on appeal. And in the case, there's a short section of our brief on this, in the case of constitutional violations where there's a specific intent requirement, like First Amendment retaliation, excessive force under the Eighth Amendment, purpose to harm, the factual finding that there's that purpose to harm gets rolled into the qualified immunity inquiry. So you can't say that an officer was acting reasonably with this purpose to harm. You can decide maybe the force, if it's a regular Fourth Amendment case, you can decide maybe the force was unreasonable, but he acted reasonably. But if the defendant is acting with a purpose to harm, that is, by definition, unreasonable. He couldn't have believed he was acting in accordance with the law. Could I ask you about another issue which I was concerned about, which was the failure to exhaust administrative remedies under the PLRA? Now, our case law says there has to be an individualized determination for each plaintiff. And I went through the record, and the record on Mr. Trinidad and Mr. Rodriguez is not at all specific and doesn't seem to rise to the level of what we've required. So Rodriguez says, well, I felt threatened by the camera when interviewed, and that there was sort of a generic gang-like culture. But I think we've said in McBride that you can't have these sort of vague and general reasons that would, in effect, mean that anyone in the prison doesn't have to exhaust remedies under the PLRA. Okay. So what do we do about – I thought Mr. Trinidad and Mr. Rodriguez both had very nonspecific explanations. I think the difference between Rodriguez and Trinidad and the other three plaintiffs, as you're pointing out, is that Flores, Nunez, and Sanchez had a deputy in front of them who said, you're in trouble if you file this grievance. There was a sort of direct, specific threat. Right, which is what is more typical – what we've required in our case law. Right. Well, in McBride, McBride didn't require there to be a specific threat, an explicit threat, I should say. It permitted the notion of implicit threats or feeling – as long as it was objectively reasonable that the inmate felt threatened, then that is sufficient for the objective prong of the PLRA analysis. A reasonable inmate would understand the threat to be related to using the grievance system so that the threat itself didn't have to reference the grievance system, but it did have to be an explicit threat, and the threat had to be reasonably understood as you'd better not use the grievance system, which is the case for the other three plaintiffs. Yes, and I think that my final response on this topic is that what you have with Rodriguez and Trinidad is you have this extreme violence that's occurring to them, including threats during this incident. There were threats being made over and over again, not about using the grievance system, but threats being made to them of bodily harm, coupled with the fact that, from Plaintiff's perspective, this was all in response to their protest of earlier excessive force in the jail. So they're engaging in what they believe is protest activity, and they're getting the crap beat out of them for it. And then finally, the final piece of that is both Rodriguez and Trinidad did say that they were aware of a history of retaliation in the jail for filing grievances. So everyone in the jail could say that, presumably. I mean, that was what concerned me, seemed to be contrary to the language of McBride, that you can't have something that everyone in the jail could raise. I disagree with you, Your Honor, I think to the extent that if there is, in fact, if it's credited that there is a history of retaliation in the jail for filing grievances, and inmates know about that, I think it's objectively reasonable for them to feel threatened. Just because everybody can say it, if it is actually true that there is a history of retaliation, I think that gives rise to an objective fear of retaliation. And this is not just any grievance. This is grievance against this behavior, which will, I think, fall in a different category in the sense of whether they reasonably fear that they're going to get retaliated against. Correct. As distinguished from other grievances they may have filed about, you know, am I going to get my doctor's appointment next week kind of grievances. Can you help us with this jurisdictional issue? It's extremely troublesome. Absolutely, Your Honor. And I think that what wasn't discussed so much during the appellants portion of the argument was that there really was no jurisdiction in the first place for this interlocutory appeal because of the way that the summary judgment was decided based on disputed issues of fact. So it was frivolous whether or not it was declared to be. Well, it's actually, I don't think it's actually an issue of frivolousness at all. There needs to be a final, for purposes of foresight, there needs to be a final order to be appealed interlocutorily. And if the order is denying qualified immunity based on disputed issues of fact, then it's simply not an appealable order. It's always on that basis, that's what a summary judgment, that there is genuine issue material fact. But we say, and the cases have said very generally, that if we can take all facts in the light most favorable to the non-moving party, we can still consider whether the moving party is entitled to judgment as a matter of law. And so there's absolutely no reason why this particular issue of qualified immunity could not be considered by the Ninth Circuit. In fact, we said, you know, bring it on. I think in this case there is a particular issue why it can't be decided. And it's because defendants never frame their qualified immunity arguments with reference to the plaintiff's facts. They're making these broad, generalized qualified immunity arguments with reference to their own facts, which is not a question to be decided. But we say that all the time. Of course, the party appealing a denial of qualified immunity tries to sneak in their own facts. I mean, there's nothing new with that. That doesn't surprise us. And we go back to the record and take the facts in the light most favorable to the non-moving party. So I don't see how that would defeat our ability to resolve that sort of appeal. I think under that scenario, however, the Supreme Court's ruling in Johnson really has no effect. I mean, what would the import of Johnson be if you can always consider the facts in the light most favorable to the plaintiff? And that is always what we do. It's not in fact, Your Honor. There are many cases where the court of appeals has said, look, you're not accepting these facts. You're not even raising legal issues that can be decided on the basis of qualified immunity. I mean, I don't know if it could be a combination of disputed facts and waiver of not making the correct argument that they could if they wanted to construe the facts in the light most favorable to plaintiff. Well, assuming that the qualified immunity appeal was properly before us and that we could have considered it, what does that do to the district court proceeding to trial on all claims, including those that were before us in the interlocutory appeal? Only the trial on the defendant's claims that were subject to the interlocutory appeal would be affected. So there were numerous defendants, and there's a chart on page 7 of the answering brief. There were numerous defendants who did not file an interlocutory appeal with respect to the plaintiff for which they were found liable. The COLA obviously did not have an interlocutory appeal, County of LA. And the 52.1 claims were not subject to interlocutory appeal. So the judgment on all of those would stand. And opposing counsel is correct that it's the punitive damages that are at stake because they were only against the supervisor defendants. Is it only punitive damages that are at stake? Only punitive damages. How about attorneys' fees? Would they be modified if some of the punitive damages are taken away, or is there at least a potential for modification? I think there is a slight potential for modification, but I do not believe that the case would have been tried the way the attorneys' fees. I don't think that the case would not have been tried differently without those supervisors because they would have been there for the 52.1 claims too. So it would just be a question of whether the punitive damage, any separate time that was spent on punitive damages issues, which maybe there was a little bit of briefing, but it would be marginal. We might want to at least give the district judge a chance to reconsider, re-evaluate. And that, of course, is setting aside the alternative route to jurisdiction of Chumon. And in this case, I think what really happened is before trial, the court was a little confused about Chumon and what plaintiffs were arguing about Chumon. And when the issue was squarely presented after the trial with the breathing room of not having 50 motions thrown at her every day in advance of trial, she determined that this was an instance where it was appropriate for Chumon. Plaintiffs had filed a motion before trial at an appropriate time. And so she made that ruling, nunk pro trunc, which, according to the cases in our brief, is an appropriate use of nunk pro trunc to correct an error that was made that was not caused by the party that was seeking the relief. Well, it wasn't an error. It was an omission, right? The nunk pro trunc. Yes. The denial was an error. Right. Filled the gap, basically. And in that regard as well, it's a point of distinguish between Stewart and Rivera-Torres because in Rivera-Torres, Rivera-Torres, this is the, you know, in Stewart, there was no equivalent of a Chumon motion before trial. The plaintiffs only filed their Chumon motion after trial. And so the court did not have an opportunity to rule on that before trial, and so there wouldn't be the same situation here as where the plaintiffs did properly seek that relief in advance of trial, and it was improperly denied, you know, if you look at the judge's previous ruling. And if you look at Rivera-Torres, it is an example of what we were just talking about of the Qualified Immunity Appeal being jurisdictionally invalid because the summary judgment was decided based on disputed issues of fact and the case presented no neat legal issues for determination on appeal, which is if you look at the Qualified Immunity arguments in this case, really what's going on? I mean, they're— They had an appeal before us, so they had an interlocutory appeal. Is that part of our case here? It is. Yeah, I thought it was. So what's your argument, assuming that that's before us, and if we say it was—it needs to be decided by us on this appeal, do you have an argument on that? Who wins on that? Are they entitled to qualified immunity? They are not entitled to qualified immunity definitively, and it's not just part of the interlocutory appeal. Defendants raise qualified immunity in their 50A and 50B motions, and so it's part of the merits appeal as well, although a very small part. Defendants have not raised any issue of unclear law except with respect to the taser defendants. I mean, it's just not—there's nothing there. And with respect to the taser defendants, they're relying on this circuit's case law about tasers in the Fourth Amendment context, which really have no bearing on the use of tasers maliciously and sadistically to cause harm. So for all of the plaintiffs, are there facts in the record that they were being held down or they were incapacitated when they were being tased by the officers? Absolutely. Some of the plaintiffs were handcuffed while they were being tased. Some of the plaintiffs were being tasered for over the course of several minutes, seven to nine different spurts of tasering. Plaintiffs were tasered—they were tasered in the anus, on the buttocks, on the soles of their feet. Really extreme tasering facts that, again, defendants never made a qualified immunity argument about. Whether or not they could have, they did not do it. Now, this goes to the frivolousness and the non-protonque. I think I know the answer, but I want to make sure I hear it. The facts that were proven that you're now referring to, were they all alleged? Prior to trial? Yeah, well, I mean, when we're—oh, I'm sorry. Were they all in—were they in front of the judge at the time of the qualified immunity determination pre-trial? I shouldn't say alleged. But were they—was there enough in the record then that we knew what facts that we were supposed to take that were all in your favor? The— I'm trying to get at the frivolousness determination, not post-talk, but the frivolous determination that should have been made under Truman, but that was not. Sure, sure. And I think the best answer to that is the summary judgment briefing was extensive, and, of course, plaintiffs' depositions were played at trial, and so their testimony was almost exactly the same, except for Plaintiff Rodriguez, who testified live, as what was in the summary judgment record. The issue that I think caused the court to have problems with the Truman motion before trial wasn't that the facts were completely in dispute. I mean, the facts have always been completely in dispute. Plaintiffs say it happened one way. Defendants say it happened a completely different way. The issue was this lack of clarity about what defendants were really arguing on in their qualified immunity appeal, what they were trying to say, other than we didn't do it, we didn't use excessive force, we weren't malicious and sadistic, all of those things. So the record— Well, what I'm trying to figure out is in granting the Truman motion non-quo-tunk, well, I'm much more willing to give it, as it were, non-quo-tunk consequence if the same set of facts the judge relies on in granting it non-quo-tunk were in front of the judge when the motion was first made. That is to say, the judge is essentially correcting an error that she made. In the summary judgment? Yes. I mean, as I said, the summary judgment record was extensive. The plaintiff's testimony, certainly about the tasering and those things, was all part of the summary judgment record. The videos of the extractions on which you can hear the tasering and the screams of pain and those sorts of things, those were all part of the summary judgment record. A number of the defendants were deposed. That was in the summary judgment record. Their reports, which admitted all of the force they used, that was in the summary judgment record. So those were all before the court. May I ask about the appellate process that occurred after the interlocutory appeal was taken? Because I got a little confused about what was going on at the Court of Appeals with respect to that. There was the receipt of the appeal, and then the Court of Appeals, or the panel, whoever it was that reviewed it, said we're not sure, and they issued a show cause order. And walk me through what happened at the appellate level after the interlocutory appeal was taken. Sure. What happened was the Court of Appeal got the appeal, saw the summary judgment order, which says there are disputed issues of fact about everything, and said it looks to us like we don't have jurisdiction for this appeal that is under Johnson, and they issued an order of show cause. And then the parties submitted briefing on that order of show cause, which defendants said, no, we're going to assume the facts and lighten what's favorable to the plaintiff. We'll do it the right way. We'll be kosher. Plaintiffs said, no, they're not. What they're really disputing is the evidence and the proof that we have of excessive force and maliciousness and sadistic excessive force. And the Court of Appeals, the order disposing, the order of show cause was essentially, this is too complicated. We'll figure out whether or not there was jurisdiction during the merits briefing. It was discharged. The OSC was discharged. Yes. And so we asked them to go on to merits. I mean, one of the arguments they made was that the district court had neglected to explain what the genuine issue of material facts were in each of the cases, and so we ordered it for briefing. I don't know what happened after that. Well, it was discharged with the notation that the issue of jurisdiction will be briefed and decided with the merits appeal. So it wasn't a decision on whether or not there was jurisdiction. It was a decision to defer that until the merits briefing. And then in the meantime, of course, the defendants also filed a motion for an emergency stay with the NYSERC. But the Court of Appeals had the same problem the district judge did in determining whether there were facts in controversy. Whether their qualified immunity appeal was anything other than complete controversy about the facts. Right. Which it wasn't. The problem they had is this is coming up to a motions panel, and motions panels, things go fast, and if it's really complicated, the motions panel will very often just say, not because necessarily there is no right or wrong answer, it's just we don't have time to do this. We're just going to send it on to the regular argument panel. That is to say, as it turns out, us. Yeah. And then also in the meantime, and my time is up, but just to finish up my last point, the defendants did file a motion for an emergency stay with the Ninth Circuit, which was denied, as was the stay they filed. Wait, wait, stay the trial? Yes. Okay.  The Ninth Circuit denied that. The district court denied it. Defendants renewed it, I believe, several times right before trial started. It was denied by the district court multiple times. So there was always a determination that the trial should go forward. Thank you, Your Honor. Well, you took us over time, or we took you over time. Why don't we put three minutes on the clock and see if we can stay within that? We might or might not be able to. Thank you. I'd like to touch first on Judge Acuda's comments about the exhaustion of administrative remedies. I don't think the record supports a finding on an objective basis that the grievance procedure was not available to these plaintiffs. They acknowledged that the procedure existed. They had filed grievances in other instances. And when you look at the McBride case, it says that in that case the only potentially relevant fact was that McBride, and that was the plaintiff, alleges is that he was beaten and that the guards who beat him made the statements. Now, there has to be something more than these generalized notions that there may be retaliation if grievances are filed. You know, if I were in the position of any of these plaintiffs and this had happened to me and I understood the L.A. County jail conditions, I'd be terrified to file a grievance. And I think McBride v. Lopez recognizes that. It recognizes that there is hostility between guards in the jails and inmates in the jails. Nonetheless, it sets forth a two-part test, a subjective standard and an objective standard. And the subjective standard is whether or not the person subjectively believes that there may be retaliation for filing a grievance. And in McBride... The problem with the grievance filing is you have to identify who is the perpetrator against you. So that makes the specific potential for retaliation or the potential for retaliation from a specific person or persons more likely, doesn't it? It does, it does. But McBride v. Lopez recognizes that. And it says there has to be an objective finding that a person of ordinary... Firmness, I think. Firmness, I believe it is. Correct, Your Honor. Would believe that he or she would be retaliated against if he filed a grievance. And that was not shown in the evidence that was submitted on the exhaustion issue in this case. I wanted to talk about the... What's the effect of our ruling in favor of you on the exhaustion claim? On the what? What's the effect of our ruling in favor of your position on the exhaustion claim? Where does that take you? That eliminates the 1983 claims. They would be dismissed. Because under the Prison Litigation Reform Act, there has to be exhaustion of administrative remedies. And so that would eliminate the 1983 claims. But if we thought that as to Trinidad and Rodriguez, that they hadn't met the standard to exhaust, how would that... If that went back, would that affect attorney's fees? What else would it affect? It would affect attorney's fees. It would affect the punitive damages awards. I'm at a loss as to what else it might affect. Thank you. Yes. Well, thank you very much. Thank you. Good arguments on both sides. Thank you very much. Tricky jurisdictional question. Rodriguez v. County of Los Angeles, submitted for decision.
judges: W. Fletcher, Ikuta, Barker